May it please the court, counsel, Aaron Lageson on behalf of Governor Kulongoski. In light of the recent Pearson decision, I'm going to focus on the clearly established law portion of this case. At least from my perspective, I'd like you to be aware of Saussure's first prong as well, because that may bear on my thoughts on this. So you do it however you want, but just know that I'm interested in the first prong as well. Okay. And with that said, I think the question here is whether a reasonable person in Governor Kulongoski's circumstances would know when he made the statements that he did, the February 15, 2005 press release and the June 6, 2006 press release, that when he did so without giving plaintiffs name-clearing hearings, that what he was doing was violating their clearly established due process rights. Can you explain what you understand a name-clearing hearing to mean in this context? It's a big mystery in this context where the defendant is the governor. In most name-clearing hearing cases, as in Ulrich, what's happened is the employer has discharged an employee or demoted them or changed their rights and status in some way, and at the same time simultaneously disseminated some kind of stigmatizing information about them, accusing them of gross misconduct or engaging in pornography or all sorts of things. And what the Supreme Court has held in those cases, because the employer has, I guess in some sense, ratified the stigmatizing allegations through the discharge or the adverse action, that the employee is entitled to a name-clearing hearing because of the reputational injury. That's why I'm a little uncertain here. I'm trying to understand. I realize you're attacking the governor being held liable. I'm just trying to understand from the state's perspective, though. If he had asked for a name-clearing hearing, is there a state mechanism like the personnel boards? Not that I'm aware of in terms of a statewide mechanism. There may have been some kind of internal processes at state. He sought name-clearing hearings from the employer, but I'm not aware of any mechanism by which Governor Kulongoski would be giving name-clearing hearings to employees at places like SAFE. Okay, well, one other clarifying question on this hearing process. Was there a demand made for one? The rubric is being expressed. I've been looking around to find out where and how does the name-clearing hearing arise? That issue was actually litigated in the district court after this case came up on appeal, and I believe what the ultimate determinations were were that this circuit does not require a request for a name-clearing hearing and that even if it did, there had been something of a request, but I believe the determination was that it was to the employer, not to the governor. Opposing counsel can correct me if I'm wrong about how that turned out. I have a question about, I don't know whether this counts as prong one or prong two or both, but it appears to me that in terms of defamation law, the statements here are in the nature of an opinion that would not ordinarily be actionable in defamation terms. I want a new direction. I lack confidence in this person. I think this person made bad decisions. Those are opinions. Is the right to a name-clearing hearing when it exists broader than defamation, or is it coextensive with defamation, or do we know? I don't think we know in this area. Again, most of the cases where it's clear-cut are the employment context where there are very specific charges levied against a certain person in the context of that person's dismissal from employment. Ulrich is a good example of that sort of case. However, the circuits to address what it takes to be a stigmatizing statement as a matter of law in this context, sometimes they refer to defamation horn books, and sometimes they just refer to other cases. I guess what is puzzling to me about this case is that it isn't really strictly an employer case, and that's why in my own mind I keep thinking of it as a defamation case, and it isn't brought that way, but I don't know when we would import, if ever, those definitions into the due process context. And I certainly think that Siegert versus Gilley gives some guidance in holding that defamation alone is not a violation of the Constitution. There has to be defamation plus something. The defendant has to discharge the employee from employment or otherwise alter the plaintiff's legal rights or status in connection with the defamatory statements. What the court said in Siegert is defamation is a tort that different states may or may not provide remedies for, but it didn't purport to adopt any type of overall standard. I'm almost asking the flip side of that. You're saying if there's defamation but no plus, there's no claim. I'm asking if there's a plus but no defamation, where do you go? If you have a statement but no defamation. If there's no defamation but plus, there would also not be a claim. And the predicate of the stigma plus claims are that the defendant has done something to interfere with the plaintiff's interest, liberty interest, in their reputation. That's why I said I want to hear about the first part of Saske. Because if you look at the restatement second of torts 564A, it makes it clear that in a defamatory situation, it doesn't just have to be something where you name a person. If the number of people involved is so small that the matter can be reasonably understood to refer to a member of the group or the circumstances of publication reasonably give rise to the conclusion that there's a particular reference to a member, that takes care of it. And in this case, in the one press release, I think it was the earlier one, the governor indicated that there had been unauthorized destruction of public records, said it was against the law, cannot be tolerated by any public official. These allegations are very serious. I think they require immediate investigation. And it was attached to the Cohen affidavit, which specifically identified one of the plaintiffs. Later on, he talked about there will be new management soon. Destroyed public records is especially troubling. And if you look at, at least as I understand in the record, if you look at the news coverage of this, the news clearly understood and interpreted this as referring to these people. So as a matter of at least the violation, hasn't enough been made? I know there are other elements to this, but as far as that aspect is concerned, hasn't the first part of that prong been satisfied? I don't think it has for several reasons. First off, all the statements you just referred to occurred long before. It occurred 19 days after. There is the nexus issue. Right. The statement that occurred 19 days after was Governor Kulongoski's reference to the report issued by the SAFE Corporation. And in that statement, he said, you know, this report identifies some changes that need to be made at SAFE, and the public also needs to be assured that this agency is behaving in an ethical and accountable manner, and that is, you know, one significant step in that direction. It's true that press release linked to the SAFE report, but that's not enough to satisfy the requirement of a stigmatizing statement, because the report didn't adopt or ratify the Cohen allegations. All along, when the Cohen allegations first came out, the governor did say that they're serious allegations and they need to be investigated, but at the same time, the governor took no position on the allegations. The investigation … Counsel, don't you think that's awfully naive? I mean, it's true. I mean, he's a former Supreme Court justice, and he's a former Attorney General of the state. He's careful in his wording. But the reality is that the public, what they read in the newspaper, what the statements said, all somebody had to do was to connect on to the Cohen allegation, and they would tie it into this one particular individual. And the governor made it very clear that this was an unauthorized destruction of public records. He said it was against the law and cannot be tolerated by any public official. If you look at the Cohen affidavit, it referred to a public official, and that was one of the plaintiffs in this action. Is that correct? It was one of the plaintiffs in the action. I want to go back. If you look in the record, when the Cohen affidavit came out, there's a press release or an article in the paper at its volume 4 ER 6566. It's a story on the contempt proceeding where the lawyers for SAFE in that proceeding vigorously contested the allegations in the Cohen affidavit. Again, the governor's official position on the allegations in the Cohen affidavit is with taking no position. The SAFE report also, while it included the Cohen affidavit, it said it recommended specifically not doing anything until the results of the investigation came out, and then ultimately the investigation was completed and Mr. Tibbetts was exonerated in the course of that investigation. And I think a person in the governor's position would look at the law out there, look at the Fourth Circuit's decision in Jackson v. Long and see the mayor reporting that a criminal investigation is going on does not violate the clearly established rights of a plaintiff. No, of course not. If you just do that. But, you know, let's take an example.  There's been a whole lot of destruction of public records. And this is just totally unlawful. And there was some affidavit somewhere that accused you personally of having been involved. A year later, completely exonerated. Completely exonerated. It had nothing to do with it. But the Argonian and all the other papers have it. It has your name there and says, you know, the governor is concerned about destruction of public documents. And this affidavit says that this lawyer, you know, the affidavit says one thing, the governor is concerned about illegal destruction. Well, it must be the same person. And again, I go back to the Fourth Circuit's decision in Jackson, which says, of course, any report of a criminal investigation carries with it some stigma. But that is not enough to violate the clearly established constitutional rights of the plaintiff. That's the second point. I want to ask you about the nexus issue because we talked about that a little bit before. In the one case here, we've got the statement 19 days after the firing. The second one was a year and a half afterwards. And you've got several cases out there. You've got the Martz case in the Second Circuit where there's a five-month period. You've got the Hadley v. DuPage County. There was a two-year. You've got Ray v. Tennessee Valley Authority where there was six years where they said it was too far. On the other hand, you've got Campanelli and others which are far, far shorter. Where does the 19-day period fall in there? It falls outside of that limit. It's a more difficult question there. But I think an official look at the Siegert case, which talked about a statement coming a few weeks later, suggests that that period of time is too late. Which case, I'm sorry? The Siegert v. Gilley, the U.S. Supreme Court case. Okay. And then, in addition, I think that one sort of factual aspect of this record in terms of suggesting that these statements lack the temporal and substantive nexus is if you look at the press coverage of the, let's see, the press coverage. Is that Volume 4, ER 118, 123? And all of that occurred before Governor Kuligowski's statements, which suggests that the public wasn't making, the media wasn't making the link between his statements and the termination. I'll reserve my remaining 30 seconds for rebuttal. I imagine we might give you some more because we've used a lot of your time. We'll hear from Ms. Massey. May it please the Court. Aruna Massey for Plaintiffs Cecil Tibbetts and David Thurber. From the plaintiff's perspective, this case really involves a mere application of settled law to new factual permutation. And we believe that this case really is about two legally sophisticated defendants who used plaintiffs as scapegoats so that they could claim to the public and to the legislature that they had, quote, unquote, cleaned house at safe. Well, I take your point. I'm a little troubled of cases that arise out of the workplace setting and say that the reform-minded governor cannot criticize operations of a state agency. He is ultimately held accountable for it. He can't make characterization about cleaved, charged misconduct without somehow tying his statement to the proffer of a pain clearing. Very awkward. And you have to at least take the one that's the strongest point on the closest time. You have the governor making statements that governors do make and, as elected, they should make. You find all sorts of things in the news now about the Justice Department and the prior administration, lots of allegations of it. The question is, what law is so clear that a governor can't, in the normal course of political activity, accountability to make such statements? Now, to point it out, there is the link to a report which then makes it specific. In that report, the absence of an express statement exhibits. But still, even if we do find that there's an arguable case on the first test violation, I have to confess I have some trouble with it. I really find it difficult to say it's clearly established that a sophisticated former attorney general, whatever he was, would know that when you're out speaking to the public like that, that somehow you have to provide the kind of civil service due process farther down the chain. Maybe you can... In response to that question, I think... The other part I have, by the way, is the other, Tibbets is named in that report, but the other plaintiff isn't, so I'm not sure there's even less of a... I think with regard to that issue, the response would be that the record is replete with all sorts of support for the personal involvement of Kulongoski in exactly what was happening at SAFE. It's Kulongoski who ordered the criminal investigation into SAFE. It's Kulongoski who told the media the various items that Judge Smith mentioned earlier, the accusations that people destroyed records, this is troubling, there's going to be new management soon. Then he personally appoints Rockland to take over as the manager at SAFE. That's what he's supposed to do. He's the governor of the state. I'm just saying, Your Honor, in response to your question, that this is turning into more of a personal supervisory kind of role with regard to that agency as opposed to an independent third party that is not involved in the running of the agency. It's more of an employment decision with regard to... I have a similar sort of procedural question. Governors don't have, as far as I know, an established procedure for name-clearing hearings. Employers, state employers do. He was not the employer. He may have told the employer what he wanted to have happen, but I don't even understand how procedurally your theory is that this should have worked. Well, the same way the governor told Kulongoski that she should feel free to fire Cecil Tibbetts, he could have told her that Cecil Tibbetts is entitled to a name-clearing hearing. But ultimately it's SAFE, presumably, that should have given him the hearing, not the governor. The governor doesn't have a hearing procedure. Well, he could have provided for one, either publicly in the same manner that... What clear law told him that he, as distinct from the employer, had to offer that kind of a hearing? Well, your case law establishes that somebody who is involved in setting into motion a deprivation of liberty interest is liable for that deprivation of liberty interest. Counselor, you know, you say you're responding to it. I don't think you are. You are treating the governor as a senior supervisor because, as governor, he goes after a state agency. But I won't repeat what I said. And for us to say a governor, before he or she can go on the attack against a state agency, which he believes has engaged in somehow is now treated as a supervisor employer, to me boggles the mind just as a matter of democracy, politics. But I understand, I do understand that the victim, the target, has very important rights here, too, and is entitled to stay. The question is whether you're going to impose a construct on a governor of a state as opposed to an institution of a state. Well, Your Honor, if you look at the Hawkins case, which is the governor case cited by defendant, in that case the court battled with this issue and said in that case the governor only had control, I think it was a nine-person commission in that case. And the court said this particular governor was not liable because he only controlled three of the people on this particular commission. In this case — Doesn't that actually get rid of the second prong of Saussure, which was what the counsel for the governor indicated? Isn't she correct that the law, even for a former Supreme Court justice and attorney general in this area, was simply not clear? You have at least these ambiguities. Number one, how long after the firing could these statements have been made and still be included within the stigma plus area? That's not clear. How about you talk about the Hawkins case? That's a First Circuit case. But the reality is they felt that because the governor, there was an independent body, the governor was not responsible because under law it was independently operating. Now, I know you allege in this situation that even though Oregon law provides that SAFE was organized in that same way, that the reality is that the way he operated, he kind of took it over. But the law in that, there is no law in the Ninth Circuit, is there, that says that it's different than, say, the Hawkins situation? Well, the court in Hawkins, when it analyzed the liberty interest, expressly looked into that fact, looked into whether or not, how much control was this governor actually exercising over what was occurring within that commission? It's not a bright-line test, is it? Isn't it unclear? And in response to your question regarding this whole, the bright-line timing issue, I think it was clear to the, or it should have been clear from the Campanelli decision that the timing issue with regard to these statements, there is no bright-line rule with regard to that. Isn't that the very point in Saussure, that in the second prong of Saussure, if the constitutional law is clear, the reasonable official, whatever it happens to be, or whoever it happens to be, knows or should have known that this is a constitutional right, you can't do this, then they can be held liable and there's no. Well, in the Barbaric case which we cited, Your Honor, that was a case out of District of California in the Ninth Circuit, and in that case it involved statements made that were two months after the termination, and the court found that that was just fine because there is no bright-line timing requirement with regard to that. And these statements were made within 19 days. They incorporated, by referring people to the SAFE website, the Cohen allegations on that same website appeared were placed links to the media coverage, because the media reasonably understood that there was some connection between the house cleaning that had been ordered by the governor and these terminations. That's what they reported. And then what does SAFE do? It places a link to that media coverage. It essentially adopts that media coverage, places it on its website, and then the governor in his press release refers people back to the SAFE website. Is your position on the question of stigma that something can be stigmatizing, even if it could not successfully be recovered for in a defamation claim? And by that I'm referring particularly to the statement of opinion, because a great deal of what the governor said would appear to be opinion. I lack confidence. I want something new. I want a new direction. Those are all opinions, which in ordinary defamation cases would not be actionable. But does that mean that they're not stigmatizing for due process purposes? I would disagree with that. I think there are two different bases for proceeding on a liberty interest claim. One is that the charges are of a nature which imputes to your reputation dishonesty or immorality or things which I think would fall within the parameters of defamation law. And there is a whole second prong, which are charges that significantly burden the employee's future employment opportunities. And in this case, the record is pretty clear. Tibbets wasn't able to find another job following this, and Thurber went on numerous interviews where he was questioned about these allegations and wasn't able to provide a sufficient response to them. Is that, in your view, is that aspect of the liberty interest, was that clearly established by 2005? Absolutely. The case that I'm citing is the Portman v. County of Santa Clara case, which explains that these are two different bases for proceeding with a liberty interest claim, and that case is from 1993. Was the governor sued in his official and individual capacity? I'm not sure on that, Your Honor. I'd have to look at the amended complaints. I believe it may be both. Counsel, can you? I can't recall. Both. I believe it was both. That's what I want to say. I'm looking at the complaint. It says individually and in, well, it's a series of people, individually and in their official capacities. Well, let's see. And then it says, except where noted, at all material times, Kuligowski was acting in the course and scope of his employment with the state of Washington. I have a question in terms of the second prong of sacier. Does the fact that the governor was a former Oregon Supreme Court justice and attorney general bear on the level of his understanding? In other words, does a typical governor, say a governor who's not a lawyer, does that governor have less of a responsibility to know or should know the law than one who has expertise, like in this case? I don't believe that issue is clearly established, Your Honor. It's a big issue, isn't it? Yeah, correct. Okay. I think in general, the point that I had wanted to make was that the record here has considerable evidence, factual support for the individual participation of Kuligowski in the various events that were occurring at SAFE. The references that he made were primarily aimed at SAFE management, which is a very small group, and if you apply the small group defamation law, I think clearly there was stigmatizing statements made here. We also believe that there was an adoption of the serious allegations raised in the report by attaching the Cohen allegations, and also malfeasance with regard to the other contracts that were referenced. And this is in response to Judge Graber's question about Plaintiff Thurber not having been individually mentioned. Plaintiff Thurber was the chief spokesperson for SAFE with regard to the AOI contract, and there was a great deal of allegations with regard to malfeasance in association with that contract. And only days, I think it was two days, the record establishes before the terminations occurred, there were a lot of media coverage with regard to the AOI contract with which Thurber was associated. And, again, this circuit hasn't adopted a bright-line test with regard to the timing requirement, and at least in the District of California, as of 87, if statements made two months following the terminations were sufficiently close in time to be considered in connection with the terminations. And here, these various allegations were placed on the SAFE website. In addition, links were placed on the SAFE website to whatever conclusions the media had drawn with regard to the terminations. So this is different than the logistic case in which the court said, you don't have an obligation to clear up any misperceptions of the media. In this case, the media was directly referenced on the SAFE website, and the Governor referred the public to the SAFE website. Does it matter that the media coverage that he referenced preceded the making of his statement? I don't believe so, Your Honor. In fact, that would support our position that there was an adoption of that by referral back to that. Does it have any bearing on whether there's a nexus to the firing or forced resignation? I believe that the court in Campanelli essentially said, you look to all of the circumstances taken together to decide whether or not there is this nexus, and we believe it's pretty clear that there was a whole series of events that took place following the Cohen allegations. And days leading up to the terminations, there are statements being made. There's the termination. The report is given, which is part of this housecleaning review, and then that's highly publicized. The terminations are publicized, and all of this is put on the website essentially within days of the terminations. Thank you. I believe you have some rebuttal time remaining. I'd first just like to refer to the Portman case, which talks about what types of statements can be stigmatizing, and it's those that charge dishonesty or moral turpitude, and then otherwise allegations that exclude a person permanently from a profession. It's not just significantly impairing, but it requires permanent exclusion from the profession to rise to the level of a constitutional violation. Beyond that, I think the law is anything but clear in this area, and for that reason the governor did not violate the clearly established constitutional rights of either Thurber or Plaintiff when he made the statements he did at the times that he did without providing them with name-clearing hearings. What's your reference to the permanent deprivation of employment opportunities in Portman? I see a reference so that he is not able to take advantage of other employment opportunities. Is that what you're referring to? I'm reading on, let's see. That's on 904. No, I'm on, it looks like, 908. 908. I quote the Rowley decision saying allegations that exclude a person permanently from a profession may also infringe a constitutionally protected liberty interest. Thank you. Thank you, counsel. The case just argued is submitted. We appreciate both sides' arguments. It's been a very interesting case, and we will stand adjourned for this session.
judges: Graber, Fisher, Smith